# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CIVIL ACTION NO. 08-00346-1** |
| **VERSUS** | * | **JUDGE JAMES** |
| **ANDRES H. REYES** | * | **MAGISTRATE JUDGE HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion to Suppress filed by the defendant, Andres H. Reyes ("Reyes") (Document No. 28). For reasons stated below, it is recommended that the motion be **DENIED.**

## BACKGROUND

The evidence presented at a hearing held on Friday, February 20, 2009, demonstrated as follows. Senior Trooper John Peters of the Louisiana State Police[1] testified that on November 8, 2008, at approximately 9:00 a.m., he was monitoring traffic from the median of I-20 eastbound near Garrett Road[2] when he initiated a traffic stop of a Chrysler Pacifica with North Carolina plates. Peters stated that he noticed the vehicle, which was traveling in the right-hand land in medium traffic, slow down out of the group as it was approaching, which was unusual because the speed limit changed at that point from 60 miles per hour to 70 miles per hour, and all of the other vehicles appeared to be speeding up. He was unable to get a speed reading on the vehicle at that time because his radar was not functioning. According to Peters, he continued to watch

---

[1] Peters testified that he is assigned to the criminal patrols unit as a K-9 handler mainly focused on criminal interdiction. He stated that criminal interdiction includes curtailing criminal activity on the interstate and involves other matters such as contraband as opposed to just ordinary traffic stops.

[2] Peters was accompanied by Trooper Jason Haneman, who was sitting in a separate patrol car next to him.

the vehicle, assuming it would speed up when the driver saw the 70-mile-per-hour speed limit sign, but instead the vehicle continued to slow. Peters stated that the vehicle slowed so much that an approaching 18-wheeler had to swerve abruptly into the left-hand lane to avoid it.[3]

Peters testified that, at that point, he pulled out into the right-hand lane and began trying to catch up to the vehicle. By pacing the vehicle, he ascertained that it was traveling at approximately 58 miles per hour.[4] After two other pick-up trucks changed lanes to go around the vehicle, Peters was left directly behind it, at which time he looked at the vehicle's license plate and ran the number "VPI 4660" through the computer. Peters stated that the plate came back as registered to a Dodge van, not a Chrysler Pacifica so he began checking to see if the vehicle was stolen. Because the license plate did not match the vehicle, he continued to monitor the vehicle for approximately three miles. He stated that during that time, the vehicle repeatedly weaved within the lane, although it did not cross the fog line or into the other lane of travel. Peters admitted that the driver of the vehicle did not attempt to evade Peters nor did Peters notice him make any movements indicating that he was trying to hide something in the vehicle. According to Peters, this was approximately a six-foot vehicle weaving in an eleven-foot travel lane, which was a "quite serious[ ] drift for that section of road." Peters then stopped the vehicle based in part on the fact it was traveling well below the speed limit and weaving within the lane. He also was under the impression that there was a registration violation based on the un-matching license plate.

---

[3] When questioned on cross-examination regarding whether he witnessed Reyes commit any traffic violations, Peters cited Reyes' slow speed as impeding traffic and weaving in his lane.

[4] Peters stated that there is no minimum speed on the interstate and there is no specific statute prohibiting an individual from traveling at 58 miles per hour; he further acknowledged that drivers are supposed to remain in the right lane unless they are passing another vehicle.

After he exited his patrol car, Peters noticed that the first letter on the license plate was a "Y," and he could not remember what license number he had entered into the computer; therefore, he notified dispatch to double check the license in order to make sure that he had the correct license number on the radio log. He stated that he then scanned the interior of the vehicle for his safety and noticed immediately that there was no luggage inside, which he thought was unusual given that the vehicle had out-of-state plates. Peters then approached the passenger window of the vehicle, advised the driver why he had been stopped, and asked for the driver's license and registration, which revealed that the driver was Andres Reyes.

According to Peters, Reyes spoke broken English. He stated that when he reached across the passenger seat to provide his license, Reyes' hand was shaking, but that such was not "terribly uncommon" under the circumstances at that time. Peters let Reyes hold the license for a moment in order to watch his hand and subsequently asked Reyes for his registration. He then asked Reyes where he was traveling from, to which Reyes responded that he was coming from Houston, Texas; this answer automatically raised Trooper Peter's suspicion based the fact that his experience from previous arrests and his training had demonstrated that Houston is a known source city for narcotics[5] and illegal activity, as is Charlotte, North Carolina, Reyes' destination as assumed by Peters based on Reyes address as shown on his drivers license. Peters did not ask Reyes where specifically in Houston he was coming from nor did he ask if he was going to Charlotte; he assumed Reyes was traveling to Charlotte because that is where his driver's license was issued. He testified that he did not know what the employment situation was in Charlotte or Houston and that he did not inquire as to whether Reyes had family in Houston.

---

[5] Peters stated that he would also have been suspicious had Reyes been traveling from Austin, Dallas, San Antonio, or Laredo.

Peters testified that Reyes told him that he was watching him in his rear view mirror, which would have explained the weaving. He stated that Reyes told him that he went to Houston to look for work at a body shop and had been there since Tuesday. According to Peters, based on his training, he immediately looked at Reyes' hands and did not notice any paint or other indication that he had worked in the body shop business. He also found it suspicious that there was no body shop work anywhere on the east coast as opposed to Houston.

Trooper Reyes testified that he then attempted to put Reyes at ease by making small talk and telling him that if he could weld, there was a lot of pipeline work in the area. As he was attempting to determine whether Reyes was exhibiting a normal amount of nervousness or and excessive amount for the situation, Peters observed that Reyes' left hand was in his lap and continued to shake. He then explained to Reyes that he was going to return to his vehicle and run some checks. He did so, and at that time he compared Reyes' registration with the plate he had entered into his computer and realized that he had initially made a mistake in that he ran the license plate as having a "V" instead of a "Y" as the first letter. According to Peters, this was the first point at which he knew the plate number had been entered improperly. He stated that he then checked the actual registration and found it was correct and that the vehicle was not stolen. Peters testified that he then entered the Think Stream program in order to check Reyes' driver's license information and criminal history, including whether he had any outstanding warrants. There were no issues with Reyes' information nor were there any outstanding warrants. He stated that he estimated that he was in his patrol car for approximately ten minutes and that he had some problems logging into the system.

Peters stated that while he was in his patrol car, based on the circumstances, i.e. Reyes' driving behavior, his explanation for his trip, the lack of luggage, the fact that he was coming

from Houston and going to Charlotte, and his nervousness, he determined that he was going to ask Reyes for consent to search the vehicle regardless of the result of the computer checks; therefore, he called Haneman for assistance. As he was waiting for Haneman, Peters decided that Reyes' driving record did not warrant him receiving a actual citation;[6] therefore, he chose to give him a verbal warning and began filling out the consent-to-search form. Because of Reyes' broken English, Peters filled the form out in Spanish so as to ensure that Reyes understood what he was reading. According to Peters, Haneman arrived about the time he was exiting his vehicle.

Once he returned to the defendant's vehicle, he asked Reyes to get out of the car and showed him the license plate information that he had entered into the computer. According to Peters, Reyes agreed that the old North Carolina license plates had blue letters and the new ones had red letters, which were still very had to read. Peters then returned all of Reyes' documentation to him and asked for consent to search the vehicle. Peters stated that he gave Reyes the form and asked him to read it and understand it. Although Peters did not speak Spanish, he stated that he always attempts to make sure that individuals understand that they are not being forced to consent to a search. Peters testified that Reyes, after reading the form and asking one question regarding whether he could get a copy of the form,[7] gave him written consent to search.

Peters then began searching Reyes' vehicle. After searching the inside of the vehicle, which was empty, he turned his attention to the undercarriage. Peters stated that it appeared that the vehicle been wrecked at some point as it was obvious that a lot of work that had been done to

---

[6] Peters stated that he was not permitted to write a warning ticket; rather, he could only write a $250 ticket, which he determined would be excessive.

[7] Peters explained that he could not give him a copy because he only had the original.

it.  He stated that there was fresh metal work and undercoating.  According to Peters, he was trying to determine if the work that had been done was the result of damage from a wreck or if the vehicle had been modified to transport contraband.  Peters then retrieved a tool called a density meter and checked the rocker panels on Reyes' vehicle.  However, as he had never searched a Chrysler Pacifica at such time, he was unsure of what his reading should have been; subsequently, he allowed Haneman to assist him in the search.  Haneman found a receipt from Houston dated November 7, 2008, the day before the stop, for one can of undercoating, which Peters testified was substantial to him based on his experience indicating that vehicles modified in the undercarriage to transport contraband are often painted with black undercoating to hide the work.

    According to Peters, Haneman then found fresh undercoating on a portion of the vehicle's inner fender on the right side in front of the rear tire.  Peters then used a tool to scrape the undercoating in search of an opening where contraband was stored, but he did not find an immediate door.  He then removed the plastic molding from the B-pillar where the doors met and removed the wiring harness, at which time he saw red plastic that was not consistent with anything that should have been in or on the vehicle.  Fairly certain that he had discovered contraband, Peters returned to Reyes and explained what he had found, at which time Reyes's English began to fade some so Peters requested that Haneman read Reyes his rights in Spanish.  Peters and Haneman then placed Reyes under formal arrest.  According to Peters, approximately thirty minutes elapsed from the time he pulled Reyes over to the time he was arrested.  As a result of the search, nine bundles of cocaine were found in the rocker panel on the right side of Reyes' vehicle and a single bundle of United States currency totaling $15,000 was found in the rocker panel on the left side.

**LAW AND ANALYSIS**

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The reasonableness of traffic stop searches and seizures under the Fourth Amendment is analyzed in accordance with the framework set forth by the Supreme Court in *Terry v. Ohio*. 392 U.S. 1 (1968). Under *Terry*, the analysis is two-tiered: (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993) (citing *Terry*, 392 U.S. at 19-20); *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001).

*A. Terry's First Prong*

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). "The Supreme Court has stated that in making a reasonable suspicion inquiry, a court must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Id.* (citations and internal quotations omitted). As the Fifth Circuit has stated, "reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.* While a "mere hunch" is not sufficient, "reasonable suspicion need not rise to the level of probable cause." *Id.* (citations omitted).

*2. Terry's Second Prong*

The second prong of the *Terry* inquiry requires that the "'detention . . . be temporary and last no longer than is necessary to effectuate the purpose of the stop ....'" *Id.* (quoting *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004)). Included in the list of actions a police officer may take pursuant to the stop are the following: (1) examine the driver's license and registration of the driver and vehicle, and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle was stolen; (2) ask a driver to exit the vehicle; and (3) ask the a driver and any passengers about the purpose and itinerary of their trip and even other unrelated questions. *See generally Brigham*, 382 F.3d at 508; *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002); *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993). Detention during these actions is reasonable under the Fourth Amendment. "[T]he officer's questions need not even be related to the purpose of the traffic stop, since '[d]etention, not questioning, is the evil at which *Terry's* second prong is aimed.'" *Lopez-Moreno*, 420 F.3d at 431. However, "[a]lthough an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention." *Id.* (citations omitted). "A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Id.*

C. *Application of Terry's First Prong*

Reyes contends that the initial stop was unjustified as he did not commit a traffic violation. As noted above, Peters testified that he stopped Reyes for three reasons: (1) he mistakenly believed that the license plate on Reyes' vehicle did not match the vehicle; (2) Reyes

8

was driving much slower than other traffic, so much so that an 18-wheeler had to abruptly change lanes to avoid him; and (3) Reyes was weaving considerably in his lane. With regard to Peters' mistaken belief that Reyes had committed a registration violation, the Fifth Circuit has held that "the good faith exception applies to cases in which a police officer errs, but nevertheless maintains a good faith and objectively reasonable belief that he has an adequate foundation to make a stop." *United States v. De Leon-Reyna*, 930 F.2d 396, 400-01 (5th Cir. 1991).

In *De Leon-Reyna*, a Border Patrol agent correctly radioed a truck's license plate number, but the dispatcher misunderstood him and ran an incorrect number which revealed that the license plate number did not match the truck. *Id.* at 398. Based on the information received and other observations, the agent stopped the truck. *Id.* In denying the defendant's motion to suppress, the lower court found that the fact that the agent was negligent in failing to follow his unit's code word radio policy precluded the application of the good faith exception. *Id.* at 399. The Fifth Circuit, however, found that even if the agent was negligent, such did not render his reliance on the information provided by the dispatcher unreasonable given that (1) the code word policy was not constitutionally or legally mandated; (2) the agent got up close to the back of truck so that he could clearly see the tag and he carefully spoke the letters into the radio; and (3) the dispatcher thought she understood the transmission and did not give the agent any reason to think she did not understand. *Id.* at 400. Therefore, the court concluded that the license plate report could not be disregarded in determining whether the agent, under the totality of the circumstances, was justified in stopping the vehicle. *Id.* at 400.

The undersigned notes, however, that there is a potentially material distinction between the circumstances in *De Leon-Reyna* and those in this case in that Peters' mistaken belief that Reyes had committed a registration violation was solely the result of his own mis-reading of the

9

license plate as opposed to reliance on externally-provided information. *See United States v. Nichols*, 142 F.3d 857, 860 n.1 (5th Cir. 1998) (noting that "the situation justifying application of the good faith exception to reasonable suspicion determinations has always involved circumstances extrinsic to the government agent's personal observations at the time of the stop"). Therefore, the applicability of the good faith exception to the circumstances at bar is questionable at best, and the undersigned is not inclined to find that Peters' mistaken, although good faith, belief that Reyes had committed a registration violation was sufficient on its own to justify the stop.

However, even disregarding the purported registration violation, the undersigned finds that there were other circumstances justifying the stop. As Peters stated, he observed Reyes driving well below the posted speed limit of 70 miles per hour and inordinately slower than other traffic, so much so that he was impeding the flow of traffic and an 18-wheeler had to abruptly swerve in order to avoid his vehicle. Therefore, although Reyes might not have violated a specific statutory traffic provision, his continued deceleration below the speed limit was creating potentially dangerous driving conditions, and the undersigned finds that Peters was justified in stopping Reyes in to address what was causing this behavior. Moreover, the Fifth Circuit has held on more than one occasion that "noticeable deceleration in the presence of a patrol car can contribute to reasonable suspicion, even though drivers often slow when they see law enforcement personnel," *see United States v. Villalobos*, 161 F.3d 285, 291 (5th Cir. 1998), *United States v. Medina*, 295 Fed.Appx. 702, 707 (5th Cir. October 10, 2008); *United States v. Vasquez*, 184 F.3d 818, *1 (5th Cir. June 16, 2009),[8] and "such deceleration may be additionally

---

[8] It should be noted that these cases involved roving border patrols and the permissibility of investigatory stops in such circumstance, the analysis of which is aided by consideration of six factors, including the behavior of the driver of the vehicle. *United States v. Cardona*, 955 F.2d

suspicious when the car was not speeding to begin with." *Villalobos*, 161 F.3d at 291. In this case, there is no indication that Reyes was speeding when he began decelerating. Therefore, the fact that Reyes decelerated in Peters' presence contributed to Peters' reasonable suspicion. Also, Peters testified that while he was following Reyes he repeatedly weaved within his own lane. The Fifth Circuit has also held that such behavior contributes to reasonable suspicion. *See United States v. Cardona*, 955 F.2d 976, 981 (5th Cir. 1992) (discussing the inference that driver's weaving shortly after agents began to follow it indicated that he was watching the agents in his rearview mirror and contributed to reasonable suspicion); *United States v. Caravantes-*

---

976, 980 (5th Cir. 1992). However, the legal frameworks governing *Terry* stops and border patrol investigatory stops are very similar; therefore, the undersigned finds the above cases to be instructive in this case. *See United States v. Villalobos*, 161 F.3d 285, 288 (5th Cir. 1998) ("Border Patrol agents on roving patrol may stop a vehicle only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that that particular vehicle is involved in illegal activity. . . . [S]ince 'reasonable suspicion' is a fact-intensive test, each case must be examined from the 'totality of the circumstances known to the agent, and the agent's experience in evaluating such circumstances.") In fact, the United States Supreme Court has analogized roving border patrol stops to *Terry* stops. *See Delaware v. Prouse*, 440 U.S. 648, 655-66 (1979); *Peirce v. Smith*, 117 F.3d 866, 878 (5th Cir. 1997) ( noting that the Supreme Court held in *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975), that roving border patrol stops were unconstitutional unless they were based on the reasonable suspicion required for a *Terry* stop); *United States v. Ballard*, 600 F.2d 1115, 1118 (5th Cir. 1979) (citation omitted) ("In *Brignoni-Ponce*, the court relied on *Terry* . . . and required that a roving border patrol 'be able to point to specific and articulable facts which, taken together with rational inference from those facts, reasonably warrant' a belief that customs laws are being violated.'").

The undersigned acknowledges that in *United States v. Brown*, 209 Fed.Appx. 450, 454 (5th Cir. 2006), the Fifth Circuit held that the *Brignoni-Pace* test did not apply to non-border patrol cases because behavior of the driver in that case, that of ducking or slouching in the vehicle, "does not have the same import outside the border context" given that "[i]n the border context, the suspected criminal activity is illegal presence in the United States." In this case, however, the behavior observed by Peters, inordinately slow driving and weaving, is not so specific to border patrol/immigration issues that it would only have significance in such context.

*Maldonado*, 51 F.3d 1045, *3 (5th Cir. March 28, 1995) (same).[9]

Therefore, although this is a close case, the undersigned finds that Reyes' slow driving, which was impeding traffic and creating potentially dangerous driving conditions, and/or deceleration in the presence of Peters, combined with the weaving as Peters followed him were sufficient, under the totality of the circumstances, to justify Peters' stop of Reyes. This finding, however, does not end the inquiry in this case, as Peters' detention of Reyes still must satisfy *Terry's* second prong.

D. *The Application of Terry's Second Prong*

The question before the Court with regard to Terry's second prong is whether Peters' actions after he legitimately stopped Reyes were reasonably related to (1) the circumstances that justified the stop, or (2) to dispelling his reasonable suspicion developed during the stop. This is because "a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." Brigham, 382 F.3d at 507 (citations omitted). The undersigned finds that Peters' questioning of Reyes was fully within the scope of detention justified by the initial valid traffic stop. As noted above, the Fifth Circuit has repeatedly held that pursuant to a valid stop, a police officer may request the driver's license and registration, run a license and criminal background check, and question the driver regarding his origin and itinerary, all of which Peters did in this case.

Moreover, Peters' questioning was well within the scope of detention justified by the initial stop, particularly after he discovered the following: (1) Reyes' nervousness as evidenced by his hand continuously shaking; (2) the fact that Reyes was traveling from Houston to Charlotte,

---

[9] As noted above, Peters testified that Reyes told him that the reason he was weaving was that he was watching the Peters in his rearview mirror.

both of which, based on Peters' training and experience, are known for narcotics and illegal activity; (3) the fact that Reyes was traveling without any luggage although he claimed that he had been in Houston since three days before the stop; and (4) the fact that Reyes claimed to have been in Houston in search of body shop work yet his hands revealed no evidence that he was employed in the body shop business. This questioning, all of which took place prior to Peters' receiving the results of the license and background checks,[10] simply exemplified a graduated response to emerging facts. In addition, although Peters had received the results of the computer checks, which were clear, at the time he obtained Reyes' consent to search the vehicle, at that point Peters had reasonable suspicion based on the totality of the circumstances to extend the duration of the stop and to ask Reyes for consent to search. Given the brief duration of the stop, less than thirty minutes between the initial stop and the formal arrest,[11] Peters' actions were reasonable.

5. *Voluntariness of Reyes's Consent*

Although Reyes does not specifically challenge the voluntariness of his consent, the undersigned finds that any such challenge would be without merit. "'To be valid, consent to search must be free and voluntary.'" *Shabazz*, 993 F.2d at 438 (quoting *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993). The government typically has the burden of proving

---

[10] *See Shabazz*, 993 F.2d at 437 (finding that questioning that took place while the officer was awaiting the result of the computer check continued to be supported by the facts that justified the initial stop).

[11] Peters testified that approximately thirty minutes elapsed from the time he stopped Reyes to the time he was ultimately arrested; therefore, given that the troopers searched the vehicle prior to the arrest, the time period from initiation of the stop to the time Reyes consented to the search was necessarily less than thirty minutes.

13

voluntary consent by a preponderance of the evidence. *Shabazz*, 993 F.2d at 438 (citing *United States v. Yeagin*, 927 F.2d 798, 800 (5th Cir.1991). However, ". . . the government's burden to prove consent by [a] preponderance of the evidence is not as heavy as it would have been had a Fourth Amendment violation preceded the consent." *United States v. Estrada*, 459 F.3d 627, 633 (5th Cir. 2006) (citing *United States v. Dortch*, 199 F.3d 193, 201 (5th Cir. 1999)).

"The voluntariness of consent is a question of fact to be determined on the totality of the circumstances." *Id.* In order to make this determination, courts look to the following factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police tactics; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) his education level and intelligence; and (6) his belief that no incriminating evidence will be found. *Id.* Although all six factors are relevant, no single factor is dispositive. *Id.*

In this case, Peters testified that when he returned to Reyes' vehicle, he explained to him the license plate information he had run and the two discussed the difficulty in reading North Carolina plates, following which he returned his license and registration prior to asking for consent to search. Although there is no indication that Peters specifically told Reyes that he was free to leave, the fact that Peters had returned Reyes' documentation and explained the misunderstanding regarding his license plate number would tend to support at least an inference that Reyes thought he was free to leave at the time he gave consent. *See United States v. Santiago*, 310 F.3d 336, 343 (5th Cir. 2002) (noting that whether the officer had returned diver's documentation at time consent was obtained was relevant to voluntariness of consent); *United States v. Jenson*, 462 F.3d 399, 407 (5th Cir. 2006) (drawing an adverse inference against the

14

Government based on the fact that no evidence was adduced indicating that defendant's license was returned before he gave consent or that he was informed that he was free to go). Therefore, this factor weighs slightly in favor of the Government.

With regard to the second factor, there is absolutely no evidence of any improperly coercive police tactics. As to whether Reyes was aware of his right to refuse consent, the consent to search form was written in Spanish as well as English and Peters testified that he always attempts to make sure that individuals understand that they are not being forced to consent to a search. Therefore, both of these factors weigh in favor of the Government as well. Likewise, there was no evidence presented indicating that the Reyes was anything other than cooperative during the stop. No evidence was presented by either side regarding Reyes' educational level and intelligence; therefore, this factor weighs in favor of neither party. Finally, although there was no direct evidence presented regarding whether Reyes believed that any incriminating evidence would be found, the fact that the drugs were well-hidden underneath the car supports at least an inference that he did not believe that the drugs would be found. *See United States v. Gurrola*, 2008 WL 5111081, *4 (5th Cir. December 5, 2008). Upon due consideration of these factors, the court finds that the consent to search was voluntarily conferred.

The undersigned further finds that, even assuming that a Fourth Amendment violation occurred in this case on the grounds that Peters' initial stop of Reyes was not justified, Reyes' consent cured any such violation. "Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation." *Id.* at 342 (quoting *United States v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir.1993). "A two-pronged inquiry is used to determine whether consent following a Fourth Amendment violation is valid: (1) whether the consent was voluntarily given,

15

and (2) whether it was an independent act of free will." *Id.* Having already determined above that Reyes' consent was voluntary, the latter determination need only be addressed. "To determine whether the causal chain was broken, [this Court considers]: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct." *Id.* (citation omitted). The burden of showing admissibility lies with the Government. *Id.*

In this case, there was no direct testimony on the length of time between when Reyes was stopped and the time he gave consent, although, as noted above, it was less than thirty minutes. The Fifth Circuit has held that a lapse of twenty or thirty minutes between the illegal conduct and the consent is necessarily characterized as a "close" temporal proximity. *United States v. Johnson*, 264 F.3d 1140, *2 (5th Cir. June 18, 2001). This finding, however, is not dispositive. *Kelley*, 981 F.2d at 1471. In *Kelley*, the Fifth Circuit held that the absence of coercive police tactics coupled with the fact that the defendant was informed of the right to refuse consent were sufficient intervening circumstances to purge the taint of a preceding Fourth Amendment violation. *Id.* at 1471-72; *Johnson*, 264 F.3d 1140 (same). Again, in this case, there is no evidence that any coercive police tactics were used and Peters testified that he always makes sure individuals understand that they are not being forced to allow him to search the vehicle. Moreover, the fact that Peters returned Reyes' documentation to him prior to requesting consent also supports the finding that there were intervening circumstances sufficient to purge the taint of any violation. *See Jenson*, 462 F.3d at 407 (noting that the fact that an individual's license has been returned to him prior to consent may be viewed as an intervening circumstance); *United States v. Santiago*, 310 F.3d 336, 343 (5th Cir. 2002) (noting that there was no indication that the

16

officer had returned the defendants' license and registration at the time he asked for consent to search in finding no intervening circumstances). Finally, the record does not reveal that Peters' sole purpose in stopping Reyes was to obtain his consent to search the vehicle for drugs. *See United States v. Benavides*, 291 Fed.Appx. 603, 608 (5th Cir. August 27, 2008) (noting that the record plainly showed that the purpose for stopping the defendant was to search his truck for drugs); *United States v. Jacquez*, 421 F.3d 338, 342 (5th Cir. 2005) (same). Rather, Peters honestly believed, albeit mistakenly, that Reyes had committed a registration violation. Moreover, Peters testified that it was not until he returned to his car to run the computer checks following his questioning of Reyes that he determined he was going to request consent to search. Based on the considerations, even assuming *arguendo* that Peters' initial stop of Reyes was unjustified, the undersigned finds that Reyes' consent was both voluntary and an independent act of free will that purged any taint of the preceding Fourth Amendment violation.

## CONCLUSION

Because the underlying stop was justified at it inception, because of the totality of the circumstances that emerged thereafter, and because Reyes gave consent to search the vehicle, the undersigned finds that the stop and search were reasonable and recommends that the motion to suppress be **DENIED**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of

17

filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 25th day of February 2009.

_____
KAREN L. HAYES
U. S. MAGISTRATE JUDGE